KELLEY DRYE & WARREN LLP
James S. Carr (JC 1603)
Thomas B. Kinzler (TK 4171)
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800

-AND-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Marc E. Kasowitz (MK 2597)
David M. Friedman (DF 4278)
Jed I. Bergman (JB 2517)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

Attorneys for Plaintiffs Turnberry/Centra Sub, LLC,
Turnberry/Centra Office Sub, LLC, Turnberry
Retail Holding, L.P., Jacquelyn Soffer and Jeffrey Soffer

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | **Case No. 08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |
| **TURNBERRY/CENTRA SUB, LLC, TURNBERRY/CENTRA OFFICE SUB, LLC, TURNBERRY RETAIL HOLDING, L.P., JACQUELYN SOFFER AND JEFFREY SOFFER,** | |
| **Plaintiffs,** | **Adv. Pro. No.** |
| **-against-** | |
| **LEHMAN BROTHERS HOLDINGS, INC. AND LEHMAN BROTHERS BANK, FSB** | |
| **Defendants.** | |

**COMPLAINT**

Plaintiffs Turnberry/Centra Sub, LLC, Turnberry/Centra Office Sub, LLC, Turnberry Retail Holding, L.P., Jacquelyn Soffer and Jeffrey Soffer (collectively, "Plaintiffs"), by and through their counsel, Kelley Drye & Warren LLP and Kasowitz, Benson, Torres & Friedman LLP, as and for their complaint against Lehman Brothers Holdings, Inc. ("Lehman Holdings") and Lehman Brothers Bank, FSB ("Lehman Bank," and, together with Lehman Holdings, "Lehman" or the "Defendants"), do hereby allege upon knowledge as to their own actions, and otherwise upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1.     This adversary proceeding arises from defendants Lehman Holdings' and Lehman Bank's breaches of contract and other wrongful conduct in connection with its their commitment to provide financing for the development of Town Square, a major 93-acre high-end, mixed-use lifestyle center including retail, restaurants, entertainment, commercial facilities, parking, office space and related improvements owned, operated, and developed by well-known developer Turnberry Associates ("Turnberry") in Las Vegas, Nevada (the "Town Square Project").  Plaintiffs, affiliates and principals of Turnberry, bring this action pursuant to Rule 7001 et seq. of the Federal Rules of Bankruptcy Procedure to redress significant commercial harm that has resulted, and threatens to result, from Lehman's misconduct.

2.     Turnberry, which has a long and successful history of developing and operating hotels, high-end shopping malls, and other residential and commercial properties, began developing the Town Square Project in 2004.  As is customary, Turnberry procured initial financing for the development stage of the project, with the expectation that when construction

and development was complete, Turnberry would replace that debt with new, long-term "take out" financing.  The initial construction financing was provided principally by Deutsche Bank Trust Company Americas ("Deutsche Bank"), consisting of, as amended, a $470 million construction loan and $50 million in mezzanine financing (collectively, the "Deutsche Bank Construction Financing").

3.      As construction proceeded, in late 2006 and early 2007, Turnberry sought long-term financing for replacement of the initial construction financing and additional development.  In connection therewith, Turnberry also sought approximately $100 million in short-term financing -- ultimately to be replaced by the long-term financing -- to finance additional components of the Town Square Project.  Several top-tier financial institutions -- including Leman, which had a long and successful history of financing Turnberry projects -- offered to provide this long-term and short-term financing to Turnberry on attractive terms.

4.      Lehman proposed a $1.5 billion multi-property financing package, at the best market rates available, for three Turnberry properties -- including the highly successful Aventura Mall in Florida and the Fountainbleau Retail project in Las Vegas, as well as Town Square -- and Turnberry accepted Lehman's proposal.  The Aventura and Fountainbleau Retail financings subsequently closed.

5.      Relying on Lehman's representations  that it would provide long-term financing for Town Square (the "Permanent Financing"), as well as a $95 million "interim advance" -- as Lehman itself characterized it -- until the long-term financing closed (the "Interim Advance," and, together with the Permanent Financing, the "Lehman Financing"), Turnberry ceased negotiations with the other financial institutions that were competing to provide long-term financing for Town Square.  Also in reliance on Lehman's representations in connection with the

Lehman Financing, Turnberry entered into a rate lock agreement to preserve a favorable interest rate until the Permanent Financing would close.

6.       In addition, at Lehman's insistence and to benefit Lehman, Plaintiffs agreed that Jacquelyn and Jeffrey Soffer, rather than a Turnberry entity, would be the technical "Borrower" for the $95 million Interim Advance.  The parties understood and agreed that the Interim Advance was, as its name suggests, an interim component of the overall Lehman Financing.  Plaintiffs would not have accepted the Interim Advance as an independent transaction.  Plaintiffs did so only in the context of assurances from Lehman with regard to the overall Lehman Financing, including that the Interim Advance would be replaced by the Permanent Financing.  The Interim Advance thus was an integral and inter-dependent component of the overall "take-out" financing agreement with Lehman.

7.       Throughout 2007 and into 2008, Lehman repeatedly assured Turnberry that it would honor its commitment to provide the Permanent Financing for the Town Square Project.  During this same timeframe, Lehman insisted that Turnberry unwind and then enter successive rate lock agreements, demanding each time that Turnberry provide Lehman with a portion of the profits.  Turnberry only agreed to takes these steps in reliance on Lehman's commitments.  As a result of Lehman's extended stringing-along, Plaintiffs were forced to arrange extensions of the Deutsche Bank Construction Financing as well as the Interim Advance.  Plaintiffs were also required to make extension fees and other payments as a result.

8.       Lehman has now made clear that it is refusing to honor its commitment to provide the Permanent Financing.  And after Lehman Holdings declared bankruptcy on September 15, 2008, Lehman even refused to honor further draw requests on the Interim Advance.  Plaintiffs have presented Lehman with two draw requests for which all conditions are

satisfied, but Lehman has simply refused to issue the mandated funds -- an unambiguous breach of the Interim Advance.

9.      The March 1, 2009 maturity date both for the Interim Advance, and for the underlying Deutsche Bank Construction Financing, is now imminent.  Plaintiffs will presently be called upon to repay the outstanding debt on the Interim Advance (approximately $72 million), as well as $520 million in connection with the Deutsche Bank Construction Financing.  And as a direct and proximate result of Lehman's breaches in connection with the Lehman Financing, Turnberry has been unable to secure the long-term financing -- from Lehman itself, as promised, or from any other lenders -- that is necessary to refinance those obligations.

10.      As a result of Lehman's breaches, Plaintiffs will suffer irreparable harm in connection with the Town Square Project and an associated project, Crossroads Property, that is discussed below.  Turnberry needs access to the remaining Interim Advance funds to complete the Town Square Project, including to pay for tenant improvements that will permit Turnberry to obtain income from the Town Square Project.  Turnberry also needs those funds to develop the Crossroads Property which, absent prompt development, Turnberry will have to forfeit back to Clark County, Nevada.

11.      Lehman Bank's failure to honor the commitment to provide the Permanent Financing will likely have severe economic consequences.  Turnberry has already paid millions of dollars in extension fees.  In addition, Plaintiffs now face the very real prospect that the Deutsche Banks Construction Financing and their obligations in connection with the Interim Advance will all mature on March 1, 2009, Turnberry will not have completed the Town Square Project or development of the Crossroads Property, and Turnberry will not have been able to secure permanent financing to "take-out" the existing loans.  Should this scenario occur, each of

the Plaintiffs would sustain significant damages.  Moreover, the failure of the Town Square and Crossroads projects would cause substantial job losses and further impact a local economy in Las Vegas that is already under profound economic stress.

12.     The adversary proceeding seeks, inter alia, a determination and award of damages against Lehman to the extent necessary to offset any liability which Plaintiffs may owe in connection with the Interim Advance.  Plaintiffs believe that their claims against Lehman exceed the amounts outstanding in connection with the Interim Advance and such excess will be asserted as a general unsecured claim pursuant to filed proofs of claim.  Plaintiffs further claim herein, inter alia, that Lehman's contractual breaches relieve Plaintiffs of any further obligation to perform or liability under the Interim Advance.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b) and 1334(b) and the Standing Order of Referral of Cases to Bankruptcy Judges, dated July 10, 1984 (Ward, Acting C.J.).  This adversary proceeding relates to the above-captioned Bankruptcy Cases now pending before this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Pursuant to 28 U.S.C. §1409(a), venue properly lies in this District where Lehman Holdings' chapter 11 case is pending.

14.     This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. §157(b)(2).

## PLAINTIFFS

15.     Turnberry/Centra Sub, LLC ("Turnberry Sub"), is a Delaware limited liability company with its principal place of business at 19501 Biscayne Boulevard, Suite 400, Aventura, Florida 33180.

16.     Turnberry/Centra Office Sub, LLC ("Turnberry Office Sub"), is a Delaware limited liability company with its principal place of business at 19501 Biscayne Boulevard, Suite 400, Aventura, Florida 33180.

17.     Turnberry Retail Holding, L.P. ("Turnberry Retail"), is a Delaware limited partnership with its principal place of business at 19501 Biscayne Boulevard, Suite 400, Aventura, Florida 33180.

18.     Jacquelyn Soffer is a citizen of the state of Florida and is domiciled at 550 Golden Beach Drive, Golden Beach, Florida 33160.

19.      Jeffrey Soffer is a citizen of the state of Florida and is domiciled at 27 Indian Creek Drive, Miami Beach, Florida 33154 (Jeffrey Soffer and Jacquelyn Soffer are referred to herein as the "Soffers").

## DEFENDANTS

20.     Lehman Holdings is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York 10022.

21.     Lehman Bank is a federally-chartered savings bank headquartered in Delaware at 1000 N. West Street, Wilmington, Delaware, 19801 and with offices in New York at 399 Park Avenue, New York, New York 10022.

## STATEMENT OF FACTS

**A.      Turnberry Overview**

22.     Turnberry Sub, Turnberry Office Sub, Turnberry Retail and numerous other related entities do business under the name of Turnberry Associates.  Turnberry is a developer of commercial and residential real estate.  Founded in 1967 by Donald Soffer, Turnberry is a global leader in the development of retail centers, luxury residential, hotel and

resort facilities and deluxe office space.  Over the past 50 years, Turnberry has developed over $7 billion in commercial and residential property, including 20 million square feet of retail space, 7,000 apartments and condominium units, 1.5 million square feet of office space and 2,000 hotel and resort rooms, including projects in Florida, Las Vegas, Nashville, San Francisco, Texas, Pennsylvania and the Bahamas.

23.     Jeffrey Soffer is the son of Donald Soffer and joined Turnberry in 1987. Since that time, Jeffrey Soffer has focused his efforts on Turnberry's residential real estate division as well as playing a significant role in Turnberry's development of shopping malls, hotels and office buildings.

24.     Jacquelyn Soffer is the daughter of Donald Soffer and joined Turnberry in 1989.  Jacquelyn Soffer is currently the managing partner of Turnberry and oversees the company's retail and office divisions and plays a significant role in Turnberry's development and management of hotels.

**B.     The Town Square Project and the Crossroads Property**

25.     In 2004, Turnberry commenced the planning of the Town Square Project, which is situated on a 93 acre parcel (the "Town Square Parcel").  Turnberry received a pre-development loan in 2004 to fund the acquisition of the Town Square Parcel and initial leasing and construction activities.  Plaintiff Turnberry Sub owns the Town Square Parcel.  The Town Square Project consists of the development of a high-end, mixed use lifestyle center including retail, restaurants, entertainment, commercial facilities, parking, office space and related improvements in Las Vegas, Nevada intended for use by Las Vegas residents as well as tourists and visitors.

26.     On October 3, 2007, Turnberry Sub conveyed through various entities a portion of the Town Square Parcel, consisting of certain air rights parcels on which an office/hotel is being developed (the "Air Rights Parcel"), to Turnberry Office Sub.

27.     In addition to the Town Square Project, Turnberry has planned to develop three adjacent parcels of land (separated from Town Square by a road) collectively known as Crossroads (the "Crossroads Property").  The Crossroads Property, which is situated on 17 acres, consists of two vacant parcels and a 12 acre parcel on which there is currently a Fry's Electronics Store.  The Crossroads Property is leased by Turnberry/Centra Crossroads, LLC ("Turnberry Crossroads"), a Turnberry affiliate, from Clark County, Nevada.  Turnberry has planned to develop a portion of the Crossroads Property into a strip center, while other parcels would include the Fry's Electronics Store.

28.     Although not completed at the time, the Town Square Project partially opened for retail use in November 2007.  With approximately 1.5 million square feet of leasable area, the Town Square Project currently features 138 retail shops, 13 restaurants, an 18 screen movie theatre and approximately 352,000 square feet of uncompleted office space.  Further development is intended to add a casino/boutique hotel as well as multi-tenant retail space on six outparcels on site.

## C.     Initial Construction and Acquisition Financing

29.     In 2006, Turnberry Sub -- which owns the Town Square Property -- and its parent Turnberry/Centra Quad, LLC ("Turnberry Quad"), entered into two loans, both dated as of October 25, 2006, to fund the construction and development of the Town Square Project.

30.     First, Turnberry Sub entered into a Construction Loan Agreement with Deutsche Bank, as agent, initial lender and as sole book-running manager and sole lead arranger (as amended, the "Construction Loan Agreement").[1]  Pursuant to the Construction Loan Agreement, the lenders agreed to lend Turnberry Sub up to $475 million for use in the construction and development of the Town Square Project.  The loan was secured by substantially all of the Town Square Property, and had an original maturity date of March 1, 2008, with possible extensions available until March 1, 2009.

31.     Second, Turnberry Quad entered into a Mezzanine Loan and Security Agreement with Deutsche Bank as agent and initial lender (the "Mezzanine Loan Agreement"). Pursuant to the Mezzanine Loan Agreement, the lenders agreed to lend Turnberry Quad up to $45 million for use in the construction and development of the Town Square Project.  The Mezzanine Loan Agreement also had an original maturity date of March 1, 2008, with possible extensions available until March 1, 2009.

32.     On January 24, 2007, the Construction Loan Agreement and Mezzanine Loan Agreement were each amended (i) to reduce the proceeds available under the Construction Loan Agreement by $5 million, to $470 million, and (ii) to correspondingly increase the proceeds available under the Mezzanine Loan Agreement by $5 million, to $50 million.

33.     In addition, Turnberry Crossroads is the borrower under two separate loans with Conseco Mortgage Capital, Inc., in the amounts of $12 million and $1.1 million respectively (the "Conseco Loan Agreements"), that were used in part to finance the acquisition of the leasehold interests in the three parcels constituting the Crossroads Property.  Turnberry

---

[1]       The loan under the Construction Loan Agreement was later syndicated out by Deutsche Bank Trust Company Americas to several lenders.

Sub, as the owner of the Town Square Property, used the proceeds of the Deutsche Bank

Construction Financing to finance the construction and development of the Town Square Project.

34.     As is industry standard, the financing provided under the Deutsche Bank

Construction Financing was intended to be used for the initial construction and development of

the Town Square Project and upon completion thereof, Turnberry would arrange for new, long

term "take-out" financing to replace the construction financing.

**D.     Turnberry Begins Negotiations For Long-Term Financing**

35.     As the construction and development of the Town Square Project

proceeded, Turnberry commenced efforts to secure long-term "permanent" financing that would

(i) replace the financing provided under the Deutsche Bank Construction Financing and the

Conseco Loan Agreements, and (ii) finance additional components of the Town Square Project

and to develop the Crossroads Property.

36.     Concurrently, Turnberry also sought short-term financing, ultimately to be

replaced by the permanent financing, in the amount of approximately $100 million, to finance

the additional components of the Town Square Project, including approximately 120,000 square

feet of a combination of office and/or hotel space, a 618 space parking garage and to commence

development of the Crossroads Property (the "Project Improvements").

37.     Given the long track record that Turnberry has had in developing high-

end, highly profitable commercial and residential property, numerous financial institutions

offered to provide this financing to Turnberry.

38.     Thus, in January and February 2007, Turnberry received term sheets from

numerous financial institutions -- including term sheets from Goldman Sachs Commercial

Mortgage Capital, L.P., Merrill Lynch Mortgage Lending, Inc., Bank of America, N.A., and CW

Capital, as well Lehman -- proposing terms for the permanent financing of the Town Square Project.

39.     The long-term financing proposals from institutions other than Lehman were attractive to Turnberry.  By way of example:

- Bank of America, N.A. provided a term sheet contemplating a 10-year, $610 million loan to be structured into senior note components, junior note components and/or mezzanine note components.

- Merrill Lynch Mortgage Lending, Inc. provided two term sheets.  The first was a 10-year, $75 million loan to finance the Project Improvements.  The second term sheet provided for a 10-year loan in the amount of $550-580 million as the permanent financing.

- Goldman Sachs Commercial Mortgage Capital, L.P. provided a term sheet with two components.  One component was a 10-year, $75 million loan to finance the Project Improvements.  The second component was a 10-year, $625 million loan to for permanent financing.

- CW Capital provided three term sheets.  The first was a 1-year, $73-75 million loan to finance the Project Improvements.  The second was a 10-year, $625 million loan for permanent financing.  A third term sheet, provided a permanent 10-year, $73-75 million loan, in the event that Turnberry opted to refinance the existing $520 million under the Construction Loan Agreement and the Mezzanine Loan Agreement.

40.     Each of these proposals contemplated that the loans would be made to a Turnberry entity.

E.       **Turnberry Negotiates A "Take-Out" Financing Package With Lehman**

41.      As alleged above, Lehman was one of the banks that approached Turnberry with a proposal for long-term financing for the Town Square Project and the Crossroads Property. Turnberry has a longstanding relationship with Lehman, and has used Lehman numerous times in the past to provide hundreds of millions of dollars of financing for the development and refinancing of several Turnberry projects including, but not limited to (a) Turnberry Place, consisting of the development of over 700 luxury high-rise condominium units in four 38-story towers in Las Vegas ($28 million); (b) Madison Towers in Las Vegas, Nevada ($18 million); (c) Fontainebleau II ($17.2 million), consisting of over 450 high-rise condominium units in a 36-story tower in Miami Beach, Florida; (d) Turnberry Village ($8 million), consisting of over 400 condominium units in two 14-story mid-rises in Aventura, Florida; (e) Aventura Mall ($430 million), consisting of a 2.8 million square foot multi-level mall; and (f) the current development of Fontainebleau Retail ($400 million), consisting of the retail project for the Fontainebleau Las Vegas hotel and casino; and (g) Monroeville Mall ($145 million and $137.5 million). Historically, every deal that Lehman ever promised Turnberry to finance was completed.

42.      In the course of these multiple projects and multiple financings, Turnberry and the Defendants had developed a special relationship of comfort and familiarity with each other whereby many technical formalities present in other lending situations were bypassed, and a custom and practice was established whereby the parties would agree to the terms of financing on an informal basis.

43.     In January 2007, Lehman approached Turnberry and, rather than simply addressing the Town Square Project, proposed a multi-property financing arrangement whereby Lehman offered to reserve approximately $1.5 billion of future financing, on the most favorable lending basis in the market, for three separate Turnberry projects: Aventura Mall in Aventura, Florida, Fontainebleau Retail in Las Vegas, Nevada and the Town Square Project.

44.     Accordingly, on January 11, 2007, Defendants sent Turnberry three separate loan outlines for these three projects.  The outlines provided for $450 million on the Aventura Mall project, $400 million in senior and mezzanine loans on the Fontainebleau Retail project and $625 million on the Town Square Project.

45.     As clear evidence of the informal basis on which Turnberry and Lehman agreed to terms, in connection with the $430 million refinancing of the Aventura Mall -- one of the three projects encompassed by the $1.5 billion Lehman proposal -- Turnberry and the Defendants ultimately closed the refinancing but never even executed a term sheet.  In fact, many of the financing transactions between Turnberry and Defendants were done on handshakes with little or no documentation until after the financing was completed, including the entry into, and unwinding, of various rate lock agreements and hedge agreements entered made in anticipation of the financing for the Town Square Project, as discussed in greater length herein.

46.     Lehman Bank offered Turnberry very favorable terms for the Lehman Financing, including combining the "take-out" financing and short-term financing of the Project Improvements into one permanent loan, more favorable breakeven spread pricing compared to other proposals, earlier closing compared to other proposals, and minimal closing conditions.

47.     In connection with its proposed multi-property long-term financing commitment, Lehman also offered Turnberry the Interim Advance -- a short-term interim advance in the amount of $95 million.  Turnberry had estimated that it needed approximately $95 million to complete the Project Improvements.  The Interim Advance was particularly attractive to Turnberry as it would give Turnberry immediate access to funds to commence the Project Improvements.  However, a commitment for the overall Lehman Financing -- including the Permanent Financing -- was necessary before Turnberry would accept the Interim Advance.

48.     Turnberry would not have accepted an interim advance without an agreement from the same lender to provide take-out financing.  The Project Improvements were not originally included under the Deutsche Bank Construction Loan Agreement and the Mezzanine Loan Agreement because such improvements did not underwrite enough to justify borrowing the money.  However, the Defendants' agreement to provide the Interim Advance as well as enter into a rate lock agreement to lock in the Permanent Financing at 5.5%, for which Turnberry paid $18.75 million, provided Turnberry the economic rationale and incentive to pursue the Project Improvements.  Absent such agreements and commitments, Turnberry would not have accepted the Interim Advance, commenced the Project Improvements or paid Lehman Bank $18.75 million in connection with the Initial Rate Lock Agreement (as defined below).

49.     On January 31, 2007, Lehman Bank provided Turnberry with a draft Mortgage Loan Application (the "Initial Mortgage Loan Application").  In connection with the Initial Mortgage Loan Application, Turnberry paid Lehman an application fee of $100,000.  The Initial Mortgage Loan Application detailed the provisions of a 10 year, $625 million loan to Turnberry (the "Permanent Financing").  The projected closing for the Permanent Financing was November 15, 2007.

50.     Based on, among other things, the approximate $1.5 billion commitment for Aventura Mall, Fontainebleau Retail, and Town Square, the favorable terms of the Mortgage Loan Application for the $625 million Permanent Financing for the Town Square Project, the commitment to provide the Interim Advance, and Turnberry's comfort level and past transaction history with Lehman, Turnberry chose the Lehman Financing offer.  Relying on Lehman's assurances that it would provide the Permanent Financing, Turnberry ceased discussions with the other financial institutions that had offered alternative permanent financing for the Town Square Project and the Crossroads Property.

51.     Ultimately, Turnberry and Defendants entered into the financing for Aventura Mall, the Fontainebleau Retail project and the Interim Advance.  However, Lehman Bank failed to provide the Permanent Financing.

**F.      Terms Of The Interim Advance**

52.     Once Lehman and Turnberry reached agreement that Lehman would provide the Lehman Financing, and while continuing to document the terms of the Permanent Financing, Lehman Holdings and Turnberry agreed, as part of the Lehman Financing, to document the $95 million Interim Advance in reliance upon Defendants' repeated representations that the Interim Advance would ultimately be replaced by the $625 million Permanent Financing.

53.     Both Lehman and Turnberry originally contemplated that the Interim Advance would be made to a Turnberry entity, presumably Turnberry Sub and Turnberry Crossroads, the owners of the Town Square Parcel and the leasehold interest in the Crossroads Property.  These parties were intended to receive, and ultimately did receive, the proceeds of the Interim Advance.  However, due to "incurrence of debt" restrictions in the Construction Loan Agreement and the Mezzanine Loan Agreement, which Defendants explicitly wanted to

avoid, and in order to expedite the Defendants' underwriting considerations, the Defendants

required that the Interim Advance be made nominally to the Soffers.

54.     Although the Soffers would never normally have agreed to be the

primary borrowers on a loan intended to be used for the Town Square Project, in this instance

-- given the longstanding history and course of dealings with Defendants, Lehman Bank's

commitment to provide the $625 million Permanent Financing by November 15, 2007, the

understanding that the Soffers would never be directly responsible for the repayment of the

Interim Advance, and the desire to obtain the loan proceeds at that time -- the Soffers acceded

to Lehman's request that they act as the nominal borrowers with respect to the Interim

Advance.  Accordingly, the Soffers entered into the Interim Advance agreement with Lehman

Holdings, dated as of July 25, 2007 (the "Interim Advance Agreement").

55.     The Interim Advance was structured as a $95 million installment term

loan that originally was set to mature, like the Construction Loan Agreement and the Mezzanine

Loan Agreement, on March 7, 2008 -- only eight months after its July 25, 2007 effective date.

Reflecting the shared understanding that the Interim Advance -- together with the existing

Deutsche Bank Construction Financing -- would shortly be replaced by Lehman's Permanent

Financing, the Interim Advance Agreement is a bare bones agreement, containing few if any

conditions, representations or warranties.

56.     The purely formal nature of the Soffers' role as borrowers is also

underscored by the fact that the Soffers themselves were not permitted to use the funds for their

own purposes.  Pursuant to Section 3.3 of the Interim Advance Agreement:

> [e]ach Advance made to Borrower shall be received, held and contributed
> by Borrower, as a capital contribution to Property Owner  (or to the
> owners of Property Owner, to be further contributed by them to Property
> Owner) to pay for the Project Costs which were specified on the Request

for Advance in accordance with which such Advance was made, and Borrower shall cause Property Owner to apply such Advances to pay for Project Costs.

57.    In addition, the budget upon which advances were based dealt exclusively with the development of the Town Square Project and the Crossroads Property.  Therefore, pursuant to the express terms of the Interim Advance Agreement, the Soffers had no rights to the proceeds of the Interim Advance, all of which had to be contributed to Turnberry Sub for costs and expenses of the Town Square Project, or to Turnberry Crossroads, for development of the Crossroads Property.

58.    The Interim Advance Agreement contains few conditions precedent to making advances.  Pursuant to Articles 3 and  4 of the Interim Advance Agreement, Lehman Holdings is not obligated to make advances unless the following requirements and conditions are satisfied:  (a) advances are on account of the Town Square Project or the Crossroads Property development costs; (b) the Borrowers have performed and complied with all terms and conditions of the Interim Advance Agreement and there is no default; and (c) no casualty or condemnation shall have occurred with regards to the Town Square Project property.

59.    The Interim Advance Agreement provides no discretion to Lehman Holdings in determining whether to advance funds requested.  Pursuant to Section 3.1.2 of the Interim Advance Agreement, upon receipt of a request for advance in proper form, Lehman Holdings agreed to disburse the advance requested.

60.    The Interim Advance is guaranteed by Turnberry Retail, which owns a 44% indirect interest in Turnberry Sub, pursuant to a Guaranty Agreement, dated as of July 25, 2007, between Lehman Holdings, as lender, and Turnberry Retail, as guarantor (the "Guaranty").

Pursuant to the Guaranty, Turnberry Retail guaranteed to Lehman Holdings the payment and performance of the obligations under the Interim Advance Agreement.

61.     The Interim Advance was further secured by approximately 49% of various pledges of interests in Turnberry/South Strip, LP, which owns an indirect 70% interest in both Turnberry Sub and Turnberry Office Sub, including:

a.      a pledge by Soffer Turnberry/South Strip, LLC of 49.7% of its 70.4% interest in Turnberry/South Strip, LP, pursuant to that certain Pledge and Security Agreement, dated as of July 25, 2007, with Lehman Holdings;

b.      a pledge by Acorn Partners LP of 49% of its 14.3% interest in Turnberry/South Strip, LP, pursuant to that certain Pledge and Security Agreement, dated as of July 25, 2007, with Lehman Holdings; and

c.      a pledge by Rony Seikaly of 49% of his 14.3% interest in Turnberry/South Strip, LP, pursuant to that certain Pledge and Security Agreement, dated as of July 25, 2007, with Lehman Holdings.

(collectively, the "Turnberry/South Strip, LP Pledges")

62.     The Interim Advance was further secured by a pledge by Centra Park, LLC, which pledged 49% of its 30% interest in Turnberry/Centra Development, LLC, which indirectly owns a 100% interest in both Turnberry Sub and Turnberry Office Sub, pursuant to that certain Pledge and Security Agreement, dated as of July 25, 2007, with Lehman Holdings (collectively with the Turnberry/South Strip, LP Pledges, the "Pledges").

63.     Finally, the Interim Advance was secured by a first priority security interest in a portion of the air rights parcel owned by Turnberry Office Sub pursuant to that certain Deed of Trust and Security Agreement, dated October 3, 2007, by Turnberry Office Sub,

as grantor, to Lawyers Title of Nevada, Inc., as trustee, for the benefit of Lehman Holdings, as beneficiary (the "Deed of Trust," and together with the Interim Advance Agreement, the Guaranty, the Pledges and all other documents executed in connection with the Interim Advance, the "Interim Advance Documents").

64.     Although it is standard industry practice that all pledges and security agreements be entered into prior to the closing of a loan agreement, the Deed of Trust was not executed until more than two months after the Interim Advance Agreement -- further demonstrating the informal nature in which the parties negotiated and closed the Interim Advance.

65.     Throughout the course of the term of the Interim Advance Agreement, draw requests were generally made by the Soffers, through their authorized agent.  Lehman Holdings did not send funds to the Soffers but instead, sent the funds directly to the account of Turnberry Sub.

**G.     Lehman Continues To Represent That It Would
         Provide The Permanent Financing**

66.     Lehman continued to assure Turnberry that it would provide the Permanent Financing, including by repeatedly presenting Turnberry with updated Mortgage Loan Applications.  Thus, on March 5, 2007, Lehman Bank submitted to Turnberry a new Mortgage Loan Application (the "Second Mortgage Loan Application").  The terms of the Second Mortgage Loan Application were substantially similar to the terms of the Initial Mortgage Loan Agreement, including a commitment to provide financing in the amount of $625 million for a 10 year period.  The projected closing was still anticipated to be by November 15, 2007.  In addition, evidencing the integrated nature of the Permanent Financing and the Interim

Advance, the Second Mortgage Loan Application explicitly provided for an interim advance of up to $100 million.

67.     On June 25, 2007, Lehman Bank submitted to Turnberry a new Mortgage Loan Application (the "Third Mortgage Loan Application").  The terms of the Third Mortgage Loan Application were substantially similar to the prior applications, including a commitment to provide financing in the amount of $625 million for a 10 year period, with a projected closing by November 15, 2007.  The Third Mortgage Loan Application still explicitly provided for an interim advance of up to the amount of $95 million -- the amount actually reflected in the Interim Advance Agreement.

68.     On September 21, 2007, after nine months of negotiations following Lehman Bank's submission of the Initial Mortgage Loan Agreement and after entry into the Interim Advance Agreement, Lehman Bank submitted a new Mortgage Loan Application to Turnberry (the "Fourth Mortgage Loan Application," and collectively with the Initial Mortgage Loan Application, the Second Mortgage Loan Application and the Third Mortgage Loan Application, the "Mortgage Loan Applications").  The terms of the Fourth Mortgage Loan Application were substantially similar to the terms of the Initial Mortgage Loan Agreement, including a commitment to provide financing in the amount of $625 million for a 10 year period. The projected closing was revised to be March 1, 2008, the date when the existing financing for the Town Square Project was then set to mature.

69.     Between September 21, 2007, and October 25, 2007, there were numerous internal meetings and extensive email correspondence between Turnberry and Lehman regarding open issues.  As of October 1, 2007, the parties recognized in email correspondence that there

were only four open issues regarding the Fourth Mortgage Loan Application, two of which, according to Lehman, were likely resolved.

70.     Consistent with the course of dealing between Lehman and Turnberry -- whereby the parties often moved directly to finalizing the loan documents without executing specific loan application documents -- Lehman Bank never executed the Fourth Mortgage Loan Application.

**H.     The Rate Lock Agreements**

71.     As additional evidence of Lehman Bank's commitment to enter into the Permanent Financing, Lehman Bank and the Soffers entered into a Rate Lock Agreement, dated March 8, 2007 (the "Initial Rate Lock Agreement"), pursuant to which Lehman Bank "locked into" a 5.5% interest rate for the $625 million while Turnberry and Lehman Bank documented the Permanent Financing.

72.     Pursuant to the terms of the Initial Rate Lock Agreement, the Soffers made a rate lock payment in the amount of $6.25 million on November 2, 2007.  In addition to these payments, the Soffers made two subsequent payments of $6.25 million as margin call deposits.  The aggregate amount of these payments equaled $18.75 million, which was funded by Lehman Holdings under the Interim Advance Agreement.

73.     The Initial Rate Lock Agreement expired by its own terms on March 8, 2008, well after the proposed November 15, 2007 closing of the Permanent Financing.  As discussed at greater length below, the Permanent Financing failed to close because of Defendants' actions and not as a result of any actions taken by Turnberry.

I.       **Lehman Repeatedly Induces Turnberry To
         Break And Re-Enter The Rate Lock Agreements**

74.      In early December 2007, as discussions regarding the terms of the

Permanent Financing continued, Defendants informed Turnberry that Lehman Bank would not

be able to provide the Permanent Financing by March 2008, as previously agreed to and as

documented in the Fourth Mortgage Loan Application.  Additionally, Defendants strongly

suggested that it would be a good strategy to break the Initial Rate Lock Agreement in order to

reap the benefits of the gain in the index hedge from certain hedge agreements entered into in

connection with the Initial Rate Lock Agreement.

75.      Defendants advised Turnberry that after the current arrangement was

unwound, Turnberry and Lehman Bank would relock under a new rate lock agreement, which

would result in a lower treasury spread, and that Lehman Bank would ultimately provide the

Permanent Financing to Turnberry.  Turnberry informed Defendants that they were declining this

offer and that Turnberry preferred to keep the current Initial Rate Lock Agreement in place.

76.      Notwithstanding Turnberry's preference to keep the Initial Rate Lock

Agreement in place, Defendants advised Turnberry that they had no choice and that Lehman

Bank was not going to be able to provide them with the Permanent Financing under the current

arrangements.  However, Defendants stated that if Turnberry unwound the Initial Rate Lock

Agreement and gave Defendants a significant portion of the gain from the unwinding of the

Initial Rate Lock Agreement, Lehman Bank would grant Turnberry credit support for another

hedge agreement for a permanent rate lock and would refinance the Town Square Project with

Permanent Financing prior to the maturity date, with extensions, of the Interim Advance

Agreement.

77.     On or about December 7, 2007, based upon these representations from the Defendants, Turnberry and the Soffers agreed to break the Initial Rate Lock Agreement.  As a result of this breakage, the Soffers were re-paid the $18.75 million previously paid for the rate lock payment and the margin call deposits which were funded from the Interim Advance.  However, Defendants required the Soffers to utilize this $18.75 million to pay down the Interim Advance.

78.     After the initial breakage of the Initial Rate Lock Agreement, the Defendants began a pattern of requiring Turnberry to enter into subsequent rate lock agreements and then requiring Turnberry to cash them out with the promise that Defendants were doing this to get the best interest rate to assist Turnberry in obtaining the Permanent Financing.

79.     After the breakage of the Initial Rate Lock Agreement, Defendants informed Turnberry that in order to ensure that Turnberry would have an interest rate that would make the Permanent Financing achievable, Turnberry should enter into a new rate lock agreement.  Defendants agreed to finance this new rate lock agreement, but required Turnberry to split all profits 50% with Defendants but to bear 100% of the risk of loss in the event that such funds were not used for the Permanent Financing.  Although Turnberry was opposed to this and attempted to negotiate against this, Defendants informed Turnberry that Turnberry would have to accept this in order for Lehman Bank to honor its commitment to provide the Permanent Financing.  Accordingly, although opposed to such demands, Turnberry agreed to enter into a new rate lock agreement and hedge agreement.

80.    On December 7, 2007, Lehman Bank provided Turnberry with a new form of Rate Lock Agreement (the "Second Rate Lock Agreement").  However, the lock amount had been reduced from $625 million to $600 million, which in part was due to the reduction of the Interim Advance, which was part of the amount needed to be financed.

81.    In January 2008, Defendants required Turnberry to unwind the Second Rate Lock Agreement and corresponding hedge agreement.  Although undocumented, Defendants also required Turnberry to split the profits of the hedge agreements with the Defendants.  As a result of the unwinding of the Initial Rate Lock Agreement and the Second Rate Lock Agreement, upon information and belief, the Soffers realized gains on the hedges in the amount of $11 million.  Pursuant to the undocumented split arrangement which Defendants required Turnberry to acquiesce to, upon information and belief, Defendants kept 50% of the profits and applied the Soffers' portion of the gain to pay down the Interim Advance as well as took a substantial fee on this transaction.

82.    On January 24, 2008, Lehman Bank provided Turnberry with yet another revised rate lock agreement which further reduced the lock amount from $600 million to $400 million (the "Third Rate Lock Agreement, and together with the Initial Rate Lock Agreement and the Second Rate Lock Agreement, the "Rate Lock Agreements").  Defendants again told Turnberry to enter into the Third Rate Lock Agreement, with the same undocumented arrangement.  Subsequently, the Defendants again required Turnberry to unwind the hedge agreement to make another gain, upon information and belief, in the amount of $1.5 million.  Upon information and belief, the Defendants again took half of the profits as a fee and utilized the other half to further pay down the Interim Advance.

83.     Each time that Defendants required Turnberry to unwind the hedge agreements to make a gain, Turnberry explicitly requested that Defendants provide documentary evidence of the gains made.  Notwithstanding these repeated requests by Turnberry, Defendants consistently and repeatedly refused to provide any evidence of the details of the unwinding, including, but not limited to, evidence of the amount or allocation of gains made in connection with each unwinding of the Rate Lock Agreements.

84.     To its detriment, Turnberry relied on the representations of Defendants that Lehman Bank would provide the Permanent Financing if Turnberry broke the Rate Lock Agreements.  Such breakages helped Lehman Holdings reduce the amount of the exposure on the Interim Advance by approximately $30 million.  Notwithstanding these representations, as discussed below, Lehman Bank never provided Turnberry with the Permanent Financing.

**J.      Lehman's Failure to Consummate the Permanent Financing**

85.     Notwithstanding Lehman Bank's commitment to provide the Permanent Financing in the amount of $625 million -- upon which Turnberry and the Soffers had relied in terminating negotiations with other financial institutions, entering into the Interim Advance Agreement, and entering into the Rate Lock Agreements -- Lehman Bank refused to consummate the Permanent Financing.  This refusal constitutes a material breach of the overall Lehman Financing agreement, excusing Plaintiffs any further obligation or liability with respect thereto -- including for repayment of the Interim Advance, since Lehman itself has failed to provide the "take-out" financing that all parties agreed would serve to repay the Interim Advance.

86.     As a result of  Lehman Bank's failure to consummate the Permanent Financing by the original target date of November 15, 2007, and because Turnberry had foregone its other financing opportunities based upon Lehman Bank's prior commitment, Turnberry was

forced to extend the maturity dates under each of the Construction Loan Agreement, the

Mezzanine Loan Agreement and the Interim Advance Agreement which were set to mature on

March 1, 2008.

87.     Thus, with no other choice, on January 16, 2008, the Soffers agreed with

Lehman Holdings to an extension of the maturity date of the Interim Advance Agreement to

September 1, 2008.  As a result, the Soffers were required to pay an extension fee in the amount

of $475,000.  Similarly, on January 30, 2008, Turnberry sent notice to Deutsche Bank of its

election to extend the maturity dates under the Construction Loan Agreement and the Mezzanine

Loan Agreement to September 1, 2008, and was required to pay extension fees in the amounts of

$587,500 and $62,500 respectively.

88.     Even after this point, Lehman Bank continued to represent that it would

provide the Permanent Financing.  Accordingly, in reliance on these representations, Turnberry

continued to submit project updates after December 2007 for the Defendants' underwriting

purposes.

89.     Notwithstanding the continued representations from Lehman Bank that it

would honor its commitment to provide the Permanent Financing, in May 2008, Turnberry

commenced efforts to re-open conversations with the financial institutions it had previously

received term sheets from as well as other new potential sources of financing.

90.     Since May 2008, Turnberry began having discussions with, and sent financing "books" to, dozens of potential lenders and brokers in an effort to secure permanent financing for the Town Square Project and for the development of the Crossroads Property. Turnberry had already built and leased the Town Square Project.  However due to the global economic changes which have occurred, Turnberry has been unable to find an alternative lender to replace Lehman Bank's Permanent Financing commitment.

91.     Unable to locate a replacement, the Turnberry entities were forced to enter into another round of extensions of the maturity dates under each of the Construction Loan Agreement, the Mezzanine Loan Agreement and the Interim Advance Agreement, all of which were set to mature on September 1, 2008.

92.     Accordingly, on July 10, 2008, the Soffers agreed with Lehman Holdings to an extension of the maturity date of the Interim Advance Agreement to March 1, 2009, and were required to pay an exorbitant extension fee in the amount of $950,000.  Similarly, on July 11, 2008, Turnberry sent notice to Deutsche Bank Trust Company Americas of its election to extend the maturity dates under the Construction Loan Agreement and the Mezzanine Loan Agreement to March 1, 2009, and was required to pay extension fees in the amounts of $587,500 and $62,500 respectively.

**K.     Lehman Holdings' Bankruptcy**

93.     On September 15, 2008, and periodically thereafter, Lehman Holdings and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  The Debtors are authorized to operate their businesses

and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**L.**     **Lehman Holdings' Failure to Honor Draw Requests**

94.    In addition to breaching its obligation to provide the Permanent Financing, Lehman has also breached its obligations under the Interim Advance Agreement.  On October 7, 2008, the Soffers, through their authorized agent, made a draw request under the Interim Advance Agreement in the amount of $1,262,526.16 (the "First Draw Request").  Lehman Holdings failed to honor the First Draw Request.

95.    On October 7, 2008, the Soffers, through their authorized agent, made an additional draw request in the amount of $399,344.57 (the "Second Draw Request," and collectively with the First Draw Request, the "Draw Requests").  Again, Lehman Holdings failed to honor the Second Draw Request within the time period prescribed by the Interim Advance Agreement.

96.    As of the dates the Soffers made the Draw Requests, there was availability under the Interim Advance Agreement in the amount of $23,542,516.68.

97.    Lehman Holdings knew that it was obligated to honor the Draw Requests under the Interim Advance Agreement but intentionally failed to do so.

**M.**     **The Damage To Turnberry**

98.    As a result of Lehman's breaches in connection with the Lehman Financing -- including Lehman Holdings' failure to honor the Draw Requests under the Interim Advance Agreement, and Lehman Bank's failure to provide the Permanent Financing -- Plaintiffs face significant problems in connection with the Town Square Project and the Crossroads Property.

99.      First, the Town Square Project has not been completed.  Significant components require additional work, including the hotel/office space which at this point is only a raw shell.  In addition, a portion of the Interim Advance was intended to be used for tenant improvements.  Without these improvements, Turnberry will be unable to lease out the remaining hotel/office space.

100.      Second, Turnberry needs access to the remaining funds available under the Interim Advance Agreement to complete the Town Square Project, including to pay for tenant improvements which will permit Turnberry to obtain income from the Town Square Project, and to develop the Crossroads Property.  Pursuant to the terms of its lease agreement with Clark County, Nevada, if Turnberry does not continue the development of the Crossroads project in short order, it will have to forfeit the Crossroads Property back to Clark County and will be unable to repay the amounts outstanding under the Conseco Loan Agreements.  Consequently, Turnberry is at risk of losing its substantial investment in the Crossroads Property.

101.      Third, Lehman Bank's failure to honor the commitment to provide the Permanent Financing will likely have severe economic consequences.  Turnberry had to pay $2.725 million in extension fees as a result of Lehman Bank's failure to meet the original March 7, 2008 closing.  In addition, to the extent that an alternative source of financing can be located, given the drastic change in the economic climate since Lehman Bank made its commitment, the cost of funds has significantly increased and alternative financing (even if available) will be substantially more expensive.

102.      Fourth, in the absence of the advances from the Interim Advance and the Permanent Financing from Lehman Bank, the Plaintiffs now face the very real prospect that the Construction Loan Agreement, the Mezzanine Loan Agreement and the Interim Advance

Agreement will all mature on March 1, 2009, Turnberry will not have completed the Town

Square Project or development of the Crossroads Property, and Turnberry will not have been

able to secure permanent financing to "take-out" the existing loans.  Should this scenario occur,

each of the Plaintiffs would sustain significant damages.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract - Interim Advance Agreement)

103.    Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 through 102 above as if fully set forth herein.

104.    The Interim Advance Agreement is a binding and enforceable contract as

part of the Lehman Financing.

105.    As of the dates the Soffers made the Draw Requests, there was availability

under the Interim Advance Agreement in the amount of $23,542,516.68.

106.    The Soffers complied with the terms of the Interim Advance Agreement in

submitting the Draw Requests to Lehman Holdings and were in compliance with all of the terms

and conditions of the Interim Advance Agreement at the time the Draw Requests were made.

107.    Pursuant to the terms of the Interim Advance Agreement, Lehman

Holdings was and continues to be required to honor the Draw Requests and otherwise to proceed

with the Lehman Financing.

108.    Lehman Holdings' failure to honor the Draw Requests and otherwise to

proceed with the Lehman Financing constitutes a breach of the Interim Advance Agreement.

109.    The Plaintiffs have suffered and continue to suffer damages, including

ordinary and special damages, as a result of Lehman Holdings' willful and wanton breach of the

Interim Advance Agreement.

110.    Accordingly, the Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman Holdings' breach of contract, plus interest, costs and fees.  Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## SECOND CLAIM FOR RELIEF

### (Anticipatory Breach of Contract - Interim Advance Agreement)

111.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

112.    The Interim Advance Agreement is a binding and enforceable contract as part of the Lehman Financing.

113.    As of the dates the Soffers made the Draw Requests, there was availability under the Interim Advance Agreement in the amount of $23,542,516.68.

114.    Pursuant to the terms of the Interim Advance Agreement, Lehman Holdings is required to honor draw requests and otherwise to proceed with the Lehman Financing.

115.    Lehman Holdings' refusal to honor the Draw Requests constitutes a clear and unequivocal indication that Lehman Holdings will not honor future draw requests and otherwise to proceed with the Lehman Financing, which constitutes an anticipatory breach of the Interim Advance Agreement.

116.    Plaintiffs have suffered and continue to suffer damages, including ordinary and special damages, as a result of Lehman Holdings' willful and wanton anticipatory breach of the Interim Advance Agreement.

117.    Accordingly, Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman Holdings' breach of contract, plus interest, costs and fees. Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract - Permanent Financing)

118.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 117 above as if fully set forth herein.

119.    On multiple occasions, Defendants verbally committed to provide the Permanent Financing to Turnberry, in the amount of $625 million.

120.    Turnberry and Lehman Bank had agreed to all of the essential terms of the Permanent Financing, which terms were included and confirmed in several written documents including the Mortgage Loan Applications.

121.    Defendants and Turnberry had a history of lending transactions and a course of dealing whereby commitments were made without executed agreements which established a course of conduct upon which Turnberry relied in foregoing formalities in documenting the Permanent Financing commitment.

122.    Lehman Bank's contract to provide the Permanent Financing is supported by its entry into the Rate Lock Agreements and the delivery of the Mortgage Loan Applications, each of which reinforced the terms of Lehman Bank's commitment.

123.    Lehman Bank failed to honor its contract to provide the Permanent Financing.

124.     The Plaintiffs have suffered and continue to suffer damages, including ordinary and special damages, as a result of Lehman Bank's willful and wanton breach of the contract for the Permanent Financing.

125.     Accordingly, the Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman Bank's breach of its commitment to provide the Permanent Financing, plus interest, costs and fees.  Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## FOURTH CLAIM FOR RELIEF

### (In the Alternative to the Third Claim for Relief)

### (Promissory Estoppel/Detrimental Reliance - Permanent Financing)

126.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 125 above as if fully set forth herein.

127.     On multiple occasions, Defendants verbally promised to provide the Permanent Financing to Turnberry, as part of the overall Lehman Financing, in the amount of $625 million.

128.     Defendants knew that Plaintiffs would rely on that promise to its detriment.

129.     Plaintiffs detrimentally relied upon the Defendants' promise to provide Permanent Financing by, among other things, foregoing alternative financing and entering into the Interim Advance Agreement.

130.     Lehman Bank failed to honor its promise to provide the Permanent Financing.

131.     The Plaintiffs have suffered and continue to suffer damages, including ordinary and special damages, as a result of Lehman Bank's willful and wanton breach of the contract for the Permanent Financing.

132.     Accordingly, the Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman Bank's breach of its commitment to provide the Permanent Financing, plus interest, costs and fees.  Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## FIFTH CLAIM FOR RELIEF

### (Anticipatory Breach - Permanent Financing)

133.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 132 above as if fully set forth herein.

134.     On multiple occasions, Defendants verbally committed to provide the Permanent Financing to Turnberry, as part of the overall Lehman Financing, in the amount of $625 million.

135.     Turnberry and Lehman Bank had agreed to all of the essential terms of the Permanent Financing, which terms were included and confirmed in several written documents including the Mortgage Loan Applications.

136.     Defendants and Turnberry had a history of lending transactions and a course of dealing whereby commitments were made without executed agreements which established a course of conduct upon which Turnberry relied in foregoing formalities in documenting the Permanent Financing commitment.

137.    Lehman Bank's contract to provide the Permanent Financing is supported by its entry into the Rate Lock Agreements and the delivery of the Mortgage Loan Applications, each of which reinforced the terms of Lehman Bank's commitment.

138.    Lehman Bank failure to honor its contract to provide the Permanent Financing constituted an anticipatory breach of the Permanent Financing contract.

139.    The Plaintiffs have suffered and continue to suffer damages, including ordinary and special damages, as a result of Lehman Bank's willful and wanton anticipatory breach of the contract for the Permanent Financing.

140.    Accordingly, the Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman Bank's breach of its contract to provide the Permanent Financing, plus interest, costs and fees.  Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

### SIXTH CLAIM FOR RELIEF

**(Detrimental Reliance - Rate Lock Agreements)**

141.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 140 above as if fully set forth herein.

142.    Turnberry entered into the Rate Lock Agreements, as part of the Lehman Financing, in order to fix the interest rate under the Permanent Financing.

143.    Defendants repeatedly forced Turnberry to unwind the Rate Lock Agreements and the related hedges.  Although Turnberry objected to doing so, Lehman represented that it would provide the Permanent Financing if Turnberry agreed to the unwinding of the agreements.

144.    In addition, Defendants required Turnberry to agree to a sharing arrangement pursuant to which Defendants received, as a fee, 50% of the gains on the various hedge arrangements.

145.    Turnberry agreed to such an arrangement solely upon the representations of the Defendants that this sharing was required to obtain the Permanent Financing.

146.    As a result of this arrangement, Defendants received substantial payments from the breakage of the Rate Lock Agreements and the unwinding of the hedge agreements. Turnberry repeatedly requested that Defendants provide it with appropriate documentation of the amount and allocations of the gains, but Lehman consistently refused.

147.    Notwithstanding the representations made by the Defendants, Lehman Bank failed to provide the Permanent Financing.

148.    The Plaintiffs have suffered damages, including ordinary and special damages, as a result of their detrimental reliance on the representations made by Defendants related to the Rate Lock Agreements.

149.    Accordingly, the Plaintiffs are entitled to judgment for all ordinary and special damages resulting from their detrimental reliance on the representations made by Defendants in connection with the Rate Lock Agreements.  Plaintiffs are also entitled to judgment declaring that as a result of Lehman's wrongdoing, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract - Lehman Financing)

150.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 149 above as if fully set forth herein.

151.     Lehman was aware that Turnberry and the Soffers would never have pursued or entered into the Interim Advance Agreement without an agreement as to Permanent Financing.  It was understood and agreed by all parties that the Lehman Financing, including both the Interim Advance and the Permanent Financing, formed a single, integrated agreement, and that the parties' obligations thereunder are interdependent obligations.

152.     Lehman has materially breached its obligations under the Lehman Financing by refusing to provide the Permanent Financing and by refusing to honor Draw Requests under the Interim Advance Agreement.

153.     Plaintiffs have fully performed all obligations required of them to be performed with respect to the Lehman Financing.

154.      Plaintiffs have suffered and continue to suffer damages, including ordinary and special damages, as a result of Lehman's actions, as set forth herein.

155.     Accordingly, Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman's breaches of contract, plus interest, costs and fees.

156.     Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## EIGHTH CLAIM FOR RELIEF

### (Anticipatory Breach - Lehman Financing)

157.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 156 above as if fully set forth herein.

158.    Lehman was aware that Turnberry and the Soffers would never have pursued or entered into the Interim Advance Agreement without an agreement as to Permanent Financing. It was understood and agreed by all parties that the Lehman Financing, including both the Interim Advance and the Permanent Financing, formed a single, integrated agreement, and that the parties' obligations thereunder are interdependent obligations.

159.    Plaintiffs have fully performed all obligations required of them to be performed with respect to the Lehman Financing.

160.    Lehman's conduct, including refusing to provide the Permanent Financing and refusing to honor Draw Requests under the Interim Advance Agreement, constitutes an anticipatory breach of the Lehman Financing agreement.

161.     Plaintiffs have suffered and continue to suffer damages, including ordinary and special damages, as a result of Lehman's actions, as set forth herein.

162.    Accordingly, Plaintiffs are entitled to judgment for all ordinary and special damages resulting from Lehman's breaches of contract, plus interest, costs and fees.

163.    Plaintiffs are also entitled to judgment declaring that as a result of Lehman's breaches, they are excused from any liability or obligation to perform under the Interim Advance Documents.

## NINTH CLAIM FOR RELIEF

### (Setoff)

164.    The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 163 above as if fully set forth herein.

165.    Plaintiffs have suffered damages as a result of Lehman Holdings' actions, as set forth herein.

166.    Plaintiffs have a right to setoff against any amounts it may owe Lehman Holdings the amount of damages that Lehman Holdings owes Plaintiffs.

167.    Accordingly, the Plaintiffs seek entry of an order permitting the Plaintiffs to setoff against any claims that Lehman Holdings has against the Plaintiffs.

## TENTH CLAIM FOR RELIEF

### (Judgment Pursuant to 28 U.S.C §2201 Declaring that Lehman Holdings' Sole Recourse Under the Interim Advance Documents Should be Against the Town Square Project)

168.    The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 167 above as if fully set forth herein.

169.    Prior to entry into the Interim Advance Agreement, Turnberry and Lehman Holdings had an initial understanding that a Turnberry entity would be the borrower under the Interim Advance Agreement.

170.    At the requirement of Lehman Holdings, and as an accommodation to Lehman Holdings so that it could avoid issues that it would face in connection with the Construction Loan Agreement and the Mezzanine Loan Agreement, and to deal with Lehman Holdings' underwriting concerns, the Soffers agreed to be the nominal borrowers under the Interim Advance Agreement.

171.    Notwithstanding this nominal statement, both the Soffers and Lehman Holdings understood that the Interim Advance was intended to be replaced by the Permanent Financing, which would be repaid by Turnberry Sub and Turnberry/Centra Crossroads, LLC.

172.    Pursuant to the Interim Advance Agreement, the Soffers had no right, title or interest to the proceeds of the Interim Advance.  All advances under the Interim Advance Agreement were required to be contributed to Turnberry Sub and to Turnberry/Centra Crossroads, LLC and could only be used for the development of the Town Square Project and the Crossroads Property.

173.    All funds under the Interim Advance Agreement were transferred directly from Lehman Holdings to the account of Turnberry Sub.

174.    The security provided to Lehman Holdings pursuant to the Interim Advance Documents was directly related to the property, including the Deed of Trust, which granted a security interest in certain air parcel rights for the Town Square Project, the Guaranty from an indirect parent of Turnberry Sub and Turnberry Office Sub, and the pledge of interests in entities that held indirect interests in Turnberry Sub and the Air Rights Parcel.

175.    Neither the Soffers nor Lehman Holdings ever intended that the Interim Advance would be repaid by the Soffers.  Instead, Lehman Holdings always understood that the advances under the Interim Advance Agreement would not be re-paid but would instead be replaced by the Permanent Financing that Lehman Bank had committed to providing to Turnberry.

176.    Accordingly, Lehman Holdings understood that it would never have direct recourse against the Soffers.

177.    By reason of the foregoing, the Plaintiffs seek entry of an order declaring that to the extent that Lehman Holdings is entitled to the repayment of any funds advanced under the Interim Advance Agreement, Lehman Holdings cannot seek repayment from the Soffers and Lehman Holdings' only recourse is against the Town Square Project.

## ELEVENTH CLAIM FOR RELIEF

### (Judgment Pursuant to 28 U.S.C §2201 Declaring that Lehman Holdings Should be Required to First Look to the Town Square Project )

178.    The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 177 above as if fully set forth herein.

179.    Prior to entry into the Interim Advance Agreement, Turnberry and Lehman Holdings had an initial understanding that a Turnberry entity would be the borrower under the Interim Advance Agreement.

180.    At the requirement of Lehman Holdings, and as an accommodation to Lehman Holdings so that it could avoid issues that it would face in connection with the Construction Loan Agreement and the Mezzanine Loan Agreement, and to deal with Lehman Holdings' underwriting concerns, the Soffers agreed to nominally be the borrowers under the Interim Advance Agreement.

181.    Notwithstanding this nominal statement, both the Soffers and Lehman Holdings understood that the real borrowers under the Interim Advance Agreement were Turnberry Sub and Turnberry/Centra Crossroads, LLC.

182.    Pursuant to the Interim Advance Agreement, the Soffers had no right, title or interest to the proceeds of the Interim Advance.  All advances under the Interim Advance Agreement were required to be contributed to Turnberry Sub and to Turnberry/Centra

Crossroads, LLC and could only be used for the development of the Town Square Project and the Crossroads Property.

183.    All funds under the Interim Advance Agreement were transferred directly from Lehman Holdings to the account of Turnberry Sub.

184.    The collateral provided to Lehman Holdings pursuant to the Interim Advance Documents was directly related to the property, including the Deed of Trust, which granted a security interest in certain air parcel rights for the Town Square Project, the Guaranty from an indirect parent of Turnberry Sub and Turnberry Office Sub, and the pledge of interests in entities that held indirect interests in Turnberry Sub and the Air Rights Parcel.

185.    Neither the Soffers nor Lehman Holdings ever intended that the Interim Advance would be repaid by the Soffers.  Instead, Lehman Holdings always understood that the advances under the Interim Advance Agreement would not be re-paid but would instead be replaced by the Permanent Financing that Lehman Bank had committed to providing to Turnberry.

186.    By reason of the foregoing, the Plaintiffs seek entry of an order declaring that Lehman Holdings should be required to look first to the Town Square Project and the collateral pledged in connection with the Interim Advance prior to seeking relief directly against the Soffers.

## TWELFTH CLAIM FOR RELIEF

### (Relief Pursuant to Sections 105(a) and 362(d) of the Bankruptcy Code)

187.     The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 186 above as if fully set forth herein.

188.     Section 105(a) of the Bankruptcy Code authorize the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

189.     Section 362(d) of the Bankruptcy Code provides that the Court shall "grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . for cause . . . ."

190.     Lehman's breaches in connection with the Lehman Financing -- including Lehman Holdings' breach of the Interim Advance Agreement and Lehman Bank's breach of its commitment to provide the Permanent Financing -- are causing substantial damage to Plaintiffs and preventing Plaintiffs from completing the Town Square Project and developing the Crossroads Property, which ultimately could result in a complete loss of the projects.

191.     If Plaintiffs cannot complete the Town Square Project and the development of the Crossroads Property, they may be unable to satisfy their obligations under the Construction Loan Agreement, the Mezzanine Loan Agreement, the Conseco Loan Agreements and the Interim Advance Agreement, which ultimately could result in a complete loss of the projects.

192.     In order to complete the Town Square Project and to develop the Crossroads Property, and correspondingly, to mitigate damages stemming from Lehman Holdings' failure to fund under the Interim Advance Agreement, Plaintiffs must be able to obtain financing from an alternative source.

193.     The collateral pledged to Lehman Holdings under the Interim Advance Documents constituted the last unencumbered assets related to the Town Square Project.

194.     Without the ability to pledge this collateral to a new lender, it is unlikely that the Plaintiffs will be able to obtain financing to complete the Town Square Project.

195.     Accordingly, "cause" exists under section 362(d) of the Bankruptcy Code to modify the automatic stay and the Court has authority under section 105(a) of the Bankruptcy Code, to compel Lehman Holdings to release any collateral under the Interim Advance Documents or subordinate Lehman Holdings' interest in the collateral to a new lender to permit the Plaintiffs to complete the Town Square Project, thereby mitigating the damages caused by Lehman Holdings.

196.     By reason of the foregoing, the Plaintiffs seek entry of an order pursuant to sections 105(a) and 362(d) of the Bankruptcy Code to release or subordinate Lehman Holdings' interest in the collateral under the Interim Advance Documents.

### THIRTEENTH CLAIM FOR RELIEF

**(Injunctive Relief under Section 105(a) of the Bankruptcy Code)**

197.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 196 above as if fully set forth herein.

198.     Lehman has breached its obligations under the Lehman Financing.  In particular:  Lehman Holdings has breached the Interim Advance Agreement by failing to honor

the Draw Requests, and Lehman Bank has failed to honor its commitment to provide the
Permanent Financing.

199.    Lehman's own breach of the Lehman Financing agreement has deprived
Turnberry of sufficient funds to complete the Town Square Project and the development of the
Crossroads Property, as well as any "take-out" financing.  As a result, Plaintiffs will be unable to
repay the amount due to Lehman Holdings upon the maturity of the Interim Advance Agreement,
to the extent any amounts are owing.

200.    Lehman Holdings should not be permitted to benefit from its and its
affiliate's breaches by exercising remedies under the Interim Advance Documents where
Plaintiffs' inability to repay is a direct result of Lehman's prior breaches.

201.    Plaintiffs will suffer irreparable harm if Lehman Holdings is permitted to
enforce its remedies under the Interim Advance Documents upon maturity to the extent that the
Plaintiffs have not obtained replacement financing.

202.    By reason of the foregoing, the Plaintiffs seek entry of an order enjoining
Lehman Holdings from exercising any remedies under the Interim Advance Documents until
such time as the Plaintiffs have been able to obtain replacement financing.

**WHEREFORE**, Plaintiffs respectfully request the following:

(1)    On the First Claim for Relief, judgment against Lehman Holdings in an
amount to be determined at trial for damages for breach of the Interim Advance Agreement, as
well as judgment declaring that as a result of Lehman's breaches, Plaintiffs are excused from any
liability or obligation to perform under the Interim Advance Documents;

(2)    On the Second Claim for Relief, judgment against Lehman Holdings in an
amount to be determined at trial for damages for anticipatory breach of the Interim Advance

Agreement as well as judgment declaring that as a result of Lehman's anticipatory breach, Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(3)       On the Third Claim for Relief, judgment against Lehman Bank in an amount to be determined at trial for damages for breach of the Permanent Financing contract, as well as judgment declaring that as a result of Lehman's breaches, Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(4)       On the Fourth Claim for Relief, as an alternative to the Third Claim for Relief, judgment against Lehman Bank in an amount to be determined at trial based on the harm to Plaintiffs for their detrimental reliance on Lehman Bank's promise to provide Permanent Financing, as well as judgment declaring that Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(5)       On the Fifth Claim for Relief, judgment against Lehman Bank in an amount to be determined at trial for damages for anticipatory breach of the Permanent Financing, as well as judgment declaring that as a result of Lehman's breaches, Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(6)       On the Sixth Claim for Relief, judgment against Defendants in an amount to be determined at trial for damages resulting from Plaintiffs' detrimental reliance on the representations of Defendants, as well as judgment declaring that Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(7)       On the Seventh Claim for Relief, judgment against Defendants in an amount to be determined at trial for damages resulting from Defendants' breach of the Lehman Financing agreement, as well as judgment declaring that as a result of Lehman's breaches,

Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(8)     On the Eighth Claim for Relief, judgment against Defendants in an amount to be determined at trial for damages resulting from Defendants' anticipatory breach of the Lehman Financing agreement, as well as judgment declaring that as a result of Lehman's breaches, Plaintiffs are excused from any liability or obligation to perform under the Interim Advance Documents;

(9)     On the Ninth Claim for Relief, declaratory judgment permitting Plaintiffs to setoff damages it has against Lehman Holdings against any claims that Lehman Holdings has against Plaintiffs;

(10)    On the Tenth Claim for Relief, declaratory judgment that Lehman Holdings' sole recourse for amounts owing under the Interim Advance Agreement is against the Town Square Property and not the Soffers;

(11)    On the Eleventh Claim for Relief, declaratory judgment that Lehman Holdings is required to look first to the Town Square Project and the collateral pledged in connection with the Interim Advance prior to seeking relief directly against the Soffers;

(12)    On the Twelfth Claim for Relief, judgment against Lehman Holdings terminating or subordinating Lehman Holdings' interests in collateral under the Interim Advance Documents to permit Plaintiffs to obtain alternative financing;

(13)    On the Thirteenth Claim for Relief, judgment granting injunctive relief preventing Lehman Holdings from exercising any rights under the Interim Advance Documents until Plaintiffs are able to secure alternative financing;

(14)    Granting plaintiffs their costs of suit, including attorneys fees; and

(15)    Granting such other and further relief as this Court deems just and proper

under the circumstances.

Dated: New York, New York
February 27, 2009

Respectfully submitted,


**KELLEY DRYE & WARREN LLP**


By: _/s/ James S. Carr_____
James S. Carr (JC 1603)
Thomas B. Kinzler (TK 4171)
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

-AND-

**KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP**

Marc E. Kasowitz (MK 2597)
David M. Friedman (DF 4278)
Jed I. Bergman (JB 2517)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Attorneys for Plaintiffs Turnberry/Centra Sub,
LLC, Turnberry/Centra Office Sub, LLC,
Turnberry Retail Holding, L.P.,
Jacquelyn Soffer and Jeffrey Soffer